**FEDERAL MEDIATION AND CONCILIATION SERVICE
ARBITRATOR CYNTHIA STANLEY, ESQ.**

In the Matter of Labor Arbitration Between: )

)

INDIANA MICHIGAN POWER )

) FMCS No. 180403-03207

Employer )

) Grievance No. AV-17-17

-and- )

) Daniel Johnson Discharge

IBEW LOCAL 1392 )

)

Union )

## UNION'S POST-HEARING BRIEF

Submitted by:

David T. Vlink
Fillenwarth Dennerline Groth & Towe, LLC
429 E. Vermont St., Ste. 200
Indianapolis, IN 46202
(317) 353-9363
DVlink@fdgtlaborlaw.com



EXHIBIT

E

**FEDERAL MEDIATION AND CONCILIATION SERVICE**
**ARBITRATOR CYNTHIA STANLEY, ESQ.**

| | |
|---|---|
| In the Matter of Labor Arbitration Between:  ) | |
| ) | |
| INDIANA MICHIGAN POWER              ) | FMCS No. 180403-03207 |
| ) | |
| Employer              ) | Grievance No. AV-17-17 |
| ) | |
| -and-              ) | Daniel Johnson Discharge |
| ) | |
| IBEW LOCAL 1392              ) | |
| ) | |
| Union              ) | |

## UNION'S POST-HEARING BRIEF

### I.  INTRODUCTION

The Company, Indiana Michigan Power (the "Company"), summarily discharged the

Grievant, Daniel Johnson, on July 20, 2017[1] for "Engaging in outside employment while on sick

leave." Johnson did not, in fact, engage in any outside employment while on sick leave, nor does

the Company even have a rule categorically prohibiting outside employment on sick leave.

Johnson's union, IBEW Local 1392 (the "Union"), filed a contractual grievance protesting

Johnson's discharge as lacking just cause as required by the parties' collective bargaining

agreement. The Grievance was pursued through the contractual grievance procedure without

resolution, and the Union advanced it to arbitration.

The parties selected Arbitrator Cynthia Stanley to hear the case from an FMCS panel of

arbitrators. The arbitration hearing was held on December 5, 2018 at the Company's

---

[1] All subsequent dates are in 2017 unless indicated otherwise.

1

headquarters in Fort Wayne, Indiana. The hearing was transcribed. There were no objections to

the procedural or substantive arbitrability of the Grievance. The parties were afforded a full and

fair opportunity to make opening statements, examine witnesses, and introduce evidence into the

record. At the conclusion of the hearing, the Parties agreed to submit post-hearing briefs, which

are due on or before February 18, 2019.

## II.   ISSUES

The issue is whether the Company discharged the Grievant, Dan Johnson, for justifiable

reasons, and if not, what is the appropriate remedy?

## III.   RELEVANT CONTRACT PROVISIONS

### A.   Master Agreement

### ARTICLE II
### MANAGEMENT AND UNION RELATIONSHIP

(a) Except as otherwise specifically limited in this Agreement, the Company has
the right to exercise the regular and customary functions of management,
subject, however, to the employee's privilege of bringing a grievance as
provided for in this Agreement.

(b) The rights, powers, and authorities mentioned in (a) above shall include but
not be confined to the following:

> (3) The authority to . . . suspend, discharge or otherwise discipline
> employees for *justifiable reasons*.

### ARTICLE XI
### ADJUSTMENT OF DIFFERENCES

**Section 2.**     **Appeal from Suspension or Discharge**

Any regular employee who considers himself improperly suspended or
discharged may bypass the first two steps of the grievance procedure and submit a
grievance in writing to the Third Step of the grievance procedure. Such grievance
must be submitted within fourteen (14) calendar days following the first day of a

2

suspension or the date of the discharge and will be otherwise handled in accordance with the grievance procedure as heretofore defined.

**Section 3.      Arbitration Procedure**

(a) In the event of a failure to satisfactorily settle or adjust any grievance involving an allegation of a violation of a provision of the Agreements according to the foregoing grievance procedure, then within thirty (30) calendar days after the answer has been given in the Third Step, such arbitrable grievance may be submitted to arbitration in the following manner:

1. The Local Union shall within said thirty (30) calendar day period give written notice to the Company of its desire to arbitrate the grievance. Such written notice shall include, at a minimum, a statement of the remedy sought in arbitration, and the specific term(s) or provision(s) of this Agreement alleged to have been violated.
2. The Company shall then request a panel of seven arbitrators from the FMCS.
3. The Company and the Local Union shall then select an arbitrator from the panel or panels submitted by the FMCS. Both the Union and the Company have the right to reject one entire panel.
4. The Arbitrator shall hold a hearing on a date satisfactory to the Company and the Local Union, for the purpose of receiving such evidence as the Parties may have to present with respect to the grievance.
5. . . .
6. Within sixty (60) calendar days after the receipt by the arbitrator of all arguments, documents and records pertaining to the grievance, he shall render in writing a statement of the findings and a decision. Such decision shall be final and binding on both Parties.

**B. Local Agreement**

**ARTICLE II**
**SENIORITY**

**Section 4.      TERMINATION OF SENIORITY**

The seniority of an employee shall terminate under any of the following conditions:

(4)      When an employee is discharged for *just cause.*

3

IV.   **STATEMENT OF FACTS**

A. **General Background**

The Company is an electrical utility operating in Indiana and elsewhere. This Grievance

arises from the Company's distribution office in Avilla, Indiana. The Company's bargaining unit

employees at the Avilla location (Line Servicers and Line Mechanics) are represented for

purposes of collective bargaining by the Union. The Company and the Union are party to two

agreements relevant to this case: (1) The "Master Agreement," which covers numerous states and

IBEW local unions (including the Union); and (2) the "Local Agreement," which is between the

Union and the Company, and covers the Fort Wayne Area. (JX 1 and 2).[2]

Johnson was hired by the Company on July 6, 2004. (Tr. 171). He started in the New

Haven/Fort Wayne district as a Line Mechanic D. (*Id.*). He completed an apprenticeship with the

Company and was eventually promoted to Lineman A, which is referred to as a "Journeyman

Lineman." (Tr. 172). Johnson transferred to the Avilla location in 2016. (Tr. 173-74). The

Lineman job is a heavy manual labor job. (Tr. 172). It requires lifting, carrying, bending,

climbing, working on uneven terrain, working in inclement weather, *etc.* (Tr. 136-37, 173).

Johnson's regular work hours were 7:00 a.m. to 3:30 p.m., Monday through Friday. (Tr. 174).

His supervisor in Avilla was Jim Stairhime. (Tr. 175).

B. **Johnson Takes a Medical Leave in 2017 for Left Knee Surgery**

On March 23, Johnson went on medical leave due to left knee pain. (Tr. 174). His knee

had been bothering him for a while, but the pain was getting more persistent, causing him to

---

[2] The two agreements, together, would appropriately be considered the entire "collective bargaining agreement" applicable to the Fort Wayne Area.

have trouble climbing into his line-truck and wearing lineman boots. (Tr. 175). The boots especially aggravated Johnson's knee because of the heavy shank in the sole of the boot and the steel toe. (*Id.*). Johnson made an appointment with Dr. Jerald Cooper, an orthopedist at Fort Wayne Orthopedics for March 23. (*Id.*; CX 1 p. 26). Fort Wayne Orthopedics is a well-regarded orthopedic hospital in Fort Wayne. (Tr. 68). The Company is familiar with Fort Wayne Orthopedics and has no reason to believe the information coming from there would be inaccurate. (Tr. 68-69). Dr. Cooper first attempted conservative treatment of physical therapy and injections to reduce the inflammation and swelling. (Tr. 176). The plan was for Johnson to return to work on April 3 "should he be able to." (CX 1 p. 5).

On March 30, Johnson was "conditionally approved" for sick pay under the Company's Sick Pay Policy. (CX 1 p. 3; JX 6). Under the Sick Pay Policy, employees are eligible to receive up to 1,040 hours of either 60% or 100% of their base pay (straight time earnings), depending on their years of service and length of time off work, while they are off work for an "illness or injury that prevents you from working." (JX 6 p. 1).

Unfortunately, conservative treatment was unsuccessful, and Johnson was unable to return to work on April 3. (CX 1 p. 15). Dr. Cooper scheduled an MRI for April 5. (Tr. 177). Dr. Cooper submitted a "Certificate of Disability" on April 6 stating, "no work pending MRI and follow up." (CX 1 p. 26). Johnson had an appointment with Dr. Cooper on April 10 to review the results of the MRI. (Tr. 177; CX 1 p. 18). The MRI showed a torn meniscus, which Dr. Cooper recommended be immediately repaired through surgery. (Tr. 177; CX 1 p. 33). On April 20, Johnson's sick pay was "conditionally approved" through May 19. (CX 1 p. 31).

Dr. Cooper performed the surgery on April 21. (Tr. 178). Johnson had a follow-up appointment with Dr. Cooper on May 2. (Tr. 178; CX 1 p. 39). On May 4, Dr. Cooper submitted a second Certificate of Disability and a Restriction Worksheet. (CX 1 pp. 39-40). Dr. Cooper recommended "no work" and stated that Johnson would be disabled until "approximately" June 30. (Tr. 178; CX 1 p. 39). On May 8, Johnson's sick pay was "conditionally approved" through June 2. (CX 1 p. 44).

Johnson's next appointment with Dr. Cooper was on June 5. (Tr. 179-80). Dr. Cooper recommended Johnson continue therapy and exercise to strengthen the knee. (Tr. 180). He told Johnson to use his knee as much as possible without causing swelling or aggravation. (*Id.*). At the June 5 appointment, Dr. Cooper decided that Johnson could return to work without restrictions on June 26. (Tr. 179; CX 1 p. 58).

Around June 20, however, Johnson was still experiencing swelling and irritation in the knee. (Tr. 181). He tried wearing a lineman boot at home, which caused his knee to swell up very quickly. (*Id.*). Therefore, Johnson made an appointment with Dr. Cooper for June 20. (*Id.*). At the June 20 appointment, Dr. Cooper gave Johnson an injection and noted that x-rays "show narrowing about the medial compartment" of the knee. (CX 1 p. 82; Tr. 183-84). Dr. Cooper's office visit notes from the June 20 appointment note that Johnson was experiencing "mild swelling," "trouble getting out of car," and "problems with an incline and decline." (CX 1 p. 111). Therefore, Dr. Cooper stated, "We had anticipated possible return to work next week. I do not think this is reasonable. I would check him back then in two to three weeks for reassessment and progression of possibly to his work status." (CX 1 p. 112). On June 20, Dr. Cooper submitted a Restriction Worksheet to the Company which stated, "Off work until follow up in 2-

6

3 weeks"; and on June 29, Dr. Cooper submitted a third Certificate of Disability stating, "No work yet." (CX 1 pp. 79, 82). Dr. Cooper indicated that Johnson's return-to-work status would be assessed at his next appointment on July 6. (*Id.*).

Dr. Cooper's office notes for the June 20 visit were sent to Johnson's rheumatologist, Dr. James Ehlich. (Tr. 183; CX 1 p. 112). Dr. Ehlich treats Johnson for rheumatoid arthritis, which he suffers from in his knees, hands, feet, and ankles. (Tr. 183). Dr. Cooper explained that the rheumatoid arthritis was the reason for his slower than anticipated recovery because "you're taking an inflamed joint and adding injury to it, inflaming it again, performing a surgery, inflaming it further, and now trying to rehab a knee that, you know, is not a normal everyday joint." (*Id.*).

Johnson was in constant communication with Stairhime during his leave to update him on how he was progressing. (Tr. 134). Johnson called Stairhime as the June 26 date approached to let him know he was not going to be able to return on June 26 as planned. (Tr. 135).

Johnson's sick pay was terminated effective June 26 because, according to the Company, there was "insufficient supporting evidence to substantiate the continuation of the sick pay benefit." (CX 1 p. 71). The Company did not consider Dr. Cooper's third Certificate of Disability or Restriction Worksheet (CX 1 pp. 79, 82) to be "objective medical evidence" to substantiate his continued need to be off work because the Medical Disability Advisory Guidelines, which is a "national database that's used by companies to determine disability and recovery times," predicted Johnson should have been recovered by June 26. (Tr. 74). Deana Hetrick, a benefits administrator at the Company's Columbus, Ohio Disability Recovery Center ("Recovery Center"), who has no medical background, made the determination that the Medical

Disability Guidelines overruled Dr. Cooper's opinion. (Tr. 74-75). The Company never obtained a second medical opinion. (Tr. 60). Ms. Hetrick agreed, however, that "every individual person recuperates from surgeries differently" and, therefore, "the Medical Disability Advisory Guidelines cannot be applied to every person in the same fashion." (Tr. 78).

At the July 6 appointment, Dr. Cooper's Physician's Assistant, Matthew Bohren, evaluated Johnson and recommended "no work until recheck." (CX 1 p. 114). Physician's Assistant Bohren recommended that Johnson "limit activity for 2 additional weeks then gradual increase before recheck." (CX 1 p. 115). Physician's Assistant Bohren submitted a Restriction Worksheet to the Company on July 6 which said, "Off work from 06/26/2017 to 07/31/2017." (CX 1 p. 98). On July 19, Dr. Cooper submitted a fourth Certificate of Disability which stated, "no work yet." (CX 1 p. 105). Dr. Cooper noted a treatment plan of "elevate as needed for swelling and pain. Limit activity for 2 additional weeks then gradual increase. Rest affected area. Continue home exercise." (*Id.*). He opined that Johnson would be able to return to work "approx. 7//31/17." (*Id.*).

The Company never offered or assigned any light-duty work to Johnson while he was off work recovering from knee surgery. (Tr. 187-88). Johnson never refused any light-duty work. (Tr. 137-38, 188). According to Stairhime, he could not assign light-duty work to Johnson until he was released to return to light-duty, which never happened. (Tr. 137). Starting in early July, Johnson began requesting to meet with Supervisor Stairhime to see what light-duty jobs he could be doing. (Tr. 188-89). He even visited the Avilla office to try to meet with Stairhime; but Stairhime was on vacation, so he spoke with Bob Mack, another supervisor about light-duty jobs he could be doing. (Tr. 189). The only light-duty option Stairhime ever mentioned to Johnson

8

was taking photos of job sites before line crews performed work on them. (Tr. 123). Stairhime did not actually offer or assign this work to Johnson; he just mentioned it as something he might have Johnson perform when he returned. (Tr. 187-89). Johnson did not refuse that assignment or say he could not do it; he simply questioned whether he would be able to do it because it required wearing line boots and walking on uneven terrain. (Tr. 123-24, 188-89, 190). Johnson was not offered any light-duty or permitted to return to work on July 31, however, because he was discharged before he was able to return to work. (JX 4).

### C. The Company Investigates Johnson for Engaging in Outside Employment on Sick Leave and Discharges Him Before He is Healed from Knee Surgery

The Company discharged Johnson on July 20 because it determined he was "engaging in outside employment" while he was on sick leave. (JX 4.). In June, the Company hired a third-party investigator to surveil Johnson because it suspected he was working as a realtor. (Tr. 63). The investigators sat outside Johnson's home for several days and followed the cars as they left and returned to Johnson's home. (Tr. 64). The investigators did not report that they saw Johnson going to work anywhere or engaging in any outside employment, which they would have reported had they seen it. (*Id.*). In fact, the investigators did not find anything unusual, and concluded that Johnson was not, in fact, working as a realtor. (Tr. 65-66).

The Company does not prohibit employees from engaging in outside employment or maintaining side-businesses, unless it interferes with their job. (Tr. 133-34). In fact, there have been other linemen in the Avilla office who have maintained side-businesses in addition to their Company jobs. (*Id*; Tr. 197-98). Stairhime testified as follows:

> Q.    If they do it [work a side-business] on their own time, evenings and weekends, that wouldn't violate company policy, would it?

A.   Only if it interferes with their job.

Q.   But as long as they don't have anything like that going on [interference with the job], if you have a side-business that you do in the evenings and weekends, that's not prohibit[ed] by company policy, it is?

A.   No.

Q.   Okay. And, in fact, there have been other employees, other linemen, in fact, who have operated and maintained side-businesses, hasn't there?

A.   Yes.

Q.   And, for example, like tree trimming? Is that a yes?

MR. DAWSON: You have to answer.

A.   I'm thinking. I'm thinking. Yeah, I believe one guy did.

Q.   Okay. And auto—like a mechanic business on the side?

A.   Yes

(Tr. 133-34).

In 2015, Johnson started thinking about opening a side-business for testing live line tools. (Tr. 195). A "live line tool" is a piece of equipment that linemen use to work on energized lines, which are required to be tested every two years. (Tr. 194-95). Johnson mentioned his idea of starting a live line tool testing business to Stairhime long before he went out on medical leave in 2017. (Tr. 145-46; 195-96). Stairhime did not tell Johnson he could not start such a business or was prohibited from maintaining a side-business. (Tr. 146, 196). Johnson envisioned the business as something he could do on evenings and weekends as his time allowed. (*Id.*). He would not have let the side-business interfere with his job at the Company because "I had a career at the company. This was just going to be a side job." (*Id.*).

10

In the early part of March 2017, before going on leave, Johnson created a flyer and a business card for his side-business, which he called "Johnson Live Line Utility Fiberglass Testing and Repair." (Tr. 196; CX 1 pp. 75-76). On June 14, Johnson filed a "Certificate of Assumed Business Name" with the Noble County Recorder. (UX 2). Johnson did not work any jobs or receive any income from the business while he was on sick leave. (Tr. 200). In fact, he did not even open a bank account for it until July 14. (UX 3). The first job Johnson worked for the business was in October 2017. (*Id.*; UX 4).

The Company learned about Johnson's side-business in June 2017 when Johnson stopped by the Company's Baer Field Training Center after a physical therapy session and showed his flyer and business card to Kim Oster. (Tr. 156, 207). Oster is a non-bargaining unit management employee. (Tr. 159-60). He had previously been Johnson's supervisor when Johnson worked in Fort Wayne. (Tr. 155). Johnson wanted to get Oster's opinion on the card and flyer because Oster had worked with similar vendors before. (Tr. 207). Oster knew Johnson was on leave at the time due to knee surgery. (Tr. 157). Oster did not tell Johnson he should not do anything related to a side-business while he was on leave, and Johnson did not think he was doing anything wrong. (Tr. 160, 208). Later that day, Oster text messaged Johnson the information for a supplier that performed tool testing work, Hi-Line Utility Supply. (Tr. 208).

Toward the end of June 2017, Johnson dropped a flyer off at Noble County REMC, which is an electric cooperative operating in Noble County, where Johnson lives. (Tr. 209). Johnson did not have an appointment; he just dropped in and asked to speak with whoever oversaw the tooling and maintenance department. (*Id.*). Stairhime learned Johnson had dropped off the flyer at Noble REMC from an individual named Todd Gray, who does the tool testing

11

work for the Company, and whose son works for Noble REMC. (Tr. 139-40). Stairhime does not

know when he spoke to Todd Gray. (Tr. 138).

On June 30, the Company engaged another outside investigator, Michael Doody, who

works for an insurance fraud investigation firm called "InfoQuest," to place a "pretext call" to

Johnson regarding his side-business. (Tr. 96, 98, 99). Mr. Doody called Johnson and told him he

was a web-site developer and asked whether Johnson was interested in a website or advertising

for his business. (Tr. 99, 201; UX 1). Johnson told Doody that he "worked with REMC

recently," and that he works full-time as a Lineman and "works his own company atop that, for

more than 15 hours, per week." (UX 1). Johnson explained that he "hyped up the business and

fluffed it" to Mr. Doody because he "was green behind the ears" and did not want to appear as if

he had not actually done the work before. (Tr. 202). Johnson explained he "was basically giving

him an outline of my plan for the business at the time," but the comments about having

performed work were not true. (*Id.*). In other words, Mr. Doody told Johnson some things that

were not true, and Johnson told Mr. Doody some things that were not true. (*Id.*). Mr. Doody did

not tell Johnson he was calling on behalf of the Company. (Tr. 203).

On July 19, the Company summoned Johnson to the Fort Wayne office to ask him

questions about his side-business. (Tr. 211). The Company's Human Resources Representative,

Tara Cooper, asked him about his side-business, and Johnson responded that he had not

performed any work for the side-business. (Tr. 212). Ms. Cooper showed Johnson the pamphlet,

and Johnson admitted it was his; he also told Ms. Cooper he had dropped off a flyer at Noble

REMC. (*Id.*). Johnson was "100 percent" honest with Ms. Cooper about the side-business during

the meeting. (*Id.*). Ms. Cooper also asked Johnson about his health, questioning why he was not

12

back at work doing light-duty. (Tr. 213). Johnson responded that he had not been able to get any light-duty work set up; he did not say he was unwilling to perform light-duty. (Tr. 213-14). Johnson asked why his sick pay had been terminated and was told the Company did not have enough information to substantiate his entitlement to it. (Tr. 214). Therefore, after the meeting, Johnson visited Fort Wayne Orthopedics, had his entire file printed, and provided it to Ms. Cooper that same day around noon. (Tr. 214-15).[3]

During the July 19 meeting, the Company also questioned Johnson about a weekend trip he had taken to Mackinac Island over the weekend of June 30. (Tr. 217). The Company's Vice-President of Distribution, Tom Kratt, saw Johnson in Mackinac with his wife, and surreptitiously photographed him. (CX 1 pp. 91-93). Johnson was walking down the sidewalk with his wife; he was not doing anything against his doctor's orders or outside of his limitations. Nevertheless, Cooper made a big deal about Johnson being at Mackinac during the meeting, asking him, "Do you know who saw you up there?" (Tr. 217). The fact that Johnson went to Mackinac Island was a major topic of discussion at the third-step grievance meeting. (Tr. 164, 234). However, the Company admitted at the arbitration hearing that there was nothing wrong with Johnson going to Mackinac Island, and that "he wasn't fired because he was on vacation in Mackinac." (Tr. 234). The Company conceded the "whole Mackinac thing is a total red-herring." (Tr. 236).

---

[3] The additional documentation included the June 20 office note wherein Dr. Cooper said it would not be "reasonable" for Johnson to return to work on June 26 due to swelling, trouble getting out of the car, and problems with incline and decline; and the July 6 office visit note wherein Physician's Assistant Bohren noted that Johnson was still experiencing "aching, sharp, and throbbing pain" and stiffness, and recommended that Johnson ice his knees 3-4 times per day for 30 minutes each time, rest the knee, limit activity for two weeks with gradual increase before recheck, and "no work until recheck." (CX 1 pp. 111-12, 114-15).

Johnson was supposed to have another meeting with Ms. Cooper on July 20 to discuss the medical records "to make sure everything was there"; however, later in the afternoon on July 19, Ms. Cooper texted him to tell him that meeting was cancelled. (Tr. 216). The Company did not even consider the additional documentation that Johnson submitted on July 19, because it had already made the decision to terminate him. (Tr. 80). Ms. Hetrick explained that the additional documentation Johnson submitted on July 19 "could have been" considered objective medical evidence to substantiate Johnson's continued need to be off work had it been considered. (Tr. 81).

Instead of considering the additional documentation Johnson submitted, Stairhime reached out to Johnson on the morning of July 20 and asked him to come to a meeting at the Avilla office. (Tr. 218). The meeting was brief—Stairhime had the discharge notice in a manila envelope and handed it to Johnson. (*Id.*). The Company confiscated Johnson's ID badge and escorted him out of the building. (Tr. 219).

### D. The Company's Work Rules Regarding Outside Employment

As previously noted, the discharge notice states that Johnson was discharged for "Engaging in outside employment while on sick leave." (JX 4). There are no Company rules or policies directly related to outside employment during a period of sick leave. In fact, Ms. Hetrick admitted there is nothing in the "sick pay policy that would prohibit an employee from maintaining a side-business while they're on sick leave." (Tr. 56). The Sick Pay Policy contains an "Other Income" section providing that income earned from other sources during a period of sick leave, including wages earned working for another employer or through self-employment, will be deducted from the sick pay benefit. (JX 6 p. 4).

14

The Company also maintains an Employee Handbook that includes a section titled, "Corrective Discipline Policies and Procedures." (JX 3 p. 21). The Corrective Discipline section includes a list of 34 Work Rules, one of which (Work Rule 30) prohibits "Engaging in outside employment or activities, which may interfere with duties and obligations to the company." (JX 3 p. 22). The Employee Handbook also contains a section titled, "Other Policies and Procedures," which includes a policy on "Outside Employment." (JX 3 p. 29). The Outside Employment policy mirrors Work Rule 30 in that it prohibits engaging in outside employment "that may interfere, directly or indirectly, with the full and proper performance on such employees' duties in, and obligations to, the company." (*Id.*).

The Corrective Discipline Section of the Employee Handbook contains a progressive discipline policy as follows:

> **Types of Disciplinary Action**
> It is company policy to recognize and applies three forms of disciplinary action:
>
> 1.  Written warning;
> 2.  Suspension, either
>       (a) Without pay and without work, or
>       (b) With pay and with work (working suspension)
> 3.  Discharge
> . . .
> Initial discipline for a particular offense is normally a written warning, followed by a suspension without pay, and finally discharge for recurrence of the same or similar offense. Discipline for exempt and supervisory employees who are not covered by the Grievance and Arbitration procedure may differ.

(JX 3 p. 23).

## V.   ARGUMENT

The burden of proof in this case rests squarely upon the Company to prove just cause for Johnson's summary discharge. *Jeffboat, LLC*, 2004 Lab. Arb. LEXIS 681 at *15 (Bell, 2004)

15

("In this disciplinary proceeding the burden of proof rests upon the company to establish 'just cause' for its disciplinary action in terminating the grievant's employment."). The just cause analysis involves several questions known as the "Seven Tests of Just Cause." The Seven Tests of Just Cause were developed by Arbitrator Carroll Daugherty in the seminal *Enterprise Wire* decision, 46 LA 359 (1966), and have since become a common method for interpreting and applying the just cause standard. A "no" answer to any one of the following questions will lead to the conclusion that just cause was lacking:

1. NOTICE: Did the employee have notice that his conduct could lead to discipline?

2. REASONABLE RULE OR ORDER: Was the rule under which the employee was disciplined reasonably related to the employer's legitimate objectives?

3. INVESTIGATION: Did the Employer investigate to determine whether the employee did, in fact, commit the violation before imposing discipline?

4. FAIR INVESTIGATION: Was the investigation fair and objective?

5. PROOF: Did the investigation result in sufficient proof that the employee committed the violation?

6. EQUAL TREATMENT: Has the employer applied its rule under which it disciplined the employee evenhandedly to all employees?

7. PENALTY: Was the degree of discipline imposed upon the employee reasonably related to the seriousness of the offense and the employee's record of service with the employer?

Koven & Smith, *Just Cause, the Seven Tests*, pp. 23-24 (BNA 2d ed. 1992).

16

## A. Application of the Just Cause Questions

### 1. Notice

The answer to the first questions—Did the employee have notice that his conduct could lead to discipline?—is emphatically "No." As Koven & Smith state in *Just Cause, the Seven Tests*:

> A fundamental component of the just cause standard is that employees must be told what kind of conduct will lead to discipline—especially if the penalty is to be discharge. An employee can hardly be expected to abide by rules the employer has not communicated, and no arbitrator is likely to uphold a penalty for conduct that the employee did not know was forbidden.

Koven & Smith, *supra*, at pp. 28-29.

Here, the Company fails the first test because it does not have any rules that categorically prohibit employees from engaging in activities related to a side-business while they are on sick leave. Ms. Hetrick, in fact, expressly admitted that there are no such rules. She was asked: "Is there anything in the sick pay policy that would prohibit an employee from maintaining a side-business while they're on sick leave?" (Tr. 56). She responded, unequivocally, "No." (*Id.*). Therefore, the Company's cited reason for discharging Johnson—"Engaging in outside employment while on sick leave" (JX 4)—is not even prohibited by Company rules or policies.

The Company rules related to "outside employment" specifically state that only outside employment "which may interfere with duties and obligations to the company" is prohibited. (JX 3 pp. 21, 29). In other words, as the Company admits, employees are permitted to engage in outside employment and/or maintain side-businesses if it does not interfere with their job. (Tr. 133-34). Other employees in the Avilla district have, in fact, maintained side-businesses such as tree trimming and auto mechanic shops. (Tr. 197, 199). There was never any issue with those

17

employees' side-businesses. (Tr. 134). The Company will say those employees did not perform work for those side-businesses while they were on sick leave. While we do not know that to be true, even if it was, Johnson did not perform any jobs for his tool testing business on leave either. The tool testing business was inchoate during the period of Johnson's sick leave and was not an actual operating business until after Johnson was discharged. More to the point, however, is the Company never published any rule or otherwise informed employees that, while they are permitted to maintain side-businesses, they are prohibited from performing any activities related to those businesses once they go on leave. In fact, the provision of the Sick Pay Policy that provides for a deduction of outside wages earned through self-employment while an employee is on sick leave indicates that employees are not expected to cease all activities related to their side-businesses while they are on leave.

Here, Johnson started taking steps to form his side-business before he went on leave. (Tr. 195-96). How was he supposed to know that once he went on leave, he could no longer give the business any attention? Are employees supposed to put their outside lives on hold when they go on sick leave? Regardless of whether such a requirement would be reasonable, the point is, there are no Company rules or policies that say that. Johnson did not know, and had no reason to know, he was doing anything wrong. (Tr. 220). If he thought he was doing something wrong, he would not have visited the Company's training center to discuss his business and show his flyer to one of the Company's supervisors. That Johnson visited the training center to discuss his business and show his flyer and business card to a supervisor proves Johnson did not know he was doing anything prohibited by Company policy.

18

In sum, the answer to the first just cause question is "No." Johnson was not on notice that he could be subject to discipline for engaging in activities related to his side-business while he was on sick leave. The Company's summary discharge of Johnson should be overturned on this basis alone. However, for the sake of completeness, the Union will proceed to examine the remaining just cause questions.

### 2.   Reasonable Rule or Order

Since there are no rules against what Johnson did, there is no need to determine whether such rules are reasonable. The Union notes, however, that there is no dispute that engaging in outside employment or maintaining a side-business which interferes with one's duties and obligations toward the Company is reasonably prohibited. But that is not really the issue here. The Company did not even allege in the discharge notice that Johnson's activities toward his side-business interfered with his duties and obligations toward the Company. The discharge notice accuses Johnson of "Engaging in outside employment while on sick leave" (JX 4), not "Engaging in outside employment while on sick leave, *which interfered with duties and obligations to the Company.*"

The more appropriate question is whether a rule categorically prohibiting all outside employment or activities related to a side-business while an employee is on sick leave is reasonable. The Union submits the answer to that question is "No." In order to be reasonable, a rule must be "related to a legitimate objective of management." Koven & Smith, *supra*, p. 99 (citing *Robertshaw Controls Co.*, 55 LA 283, 286 (Block, 1970)). A rule instructing employees they must cease any and all activities related to a side-business, regardless of whether they interfere with the employee's obligations to the Company, while they are on sick leave is not

19

related to a legitimate management objective. A legitimate management objective toward employees on sick leave would be for them to accept light-duty work which is provided to them (and which they can perform) and to follow their doctor's orders so they can return to full duty as soon as possible. If employees are not rejecting light-duty work which is offered to them and which they are medically capable of performing or doing anything which is outside of their doctor's restrictions, the employer should not be able to control the employees' activities while they are on sick leave. The Company recognizes an employee is not absolutely prohibited from working while on sick leave by virtue of the "Other Income" Section of the Sick Pay Policy. (JX 6 p. 4). This provision suggests there are, in fact, scenarios in which it would be appropriate for employees to engage in outside employment on sick leave without interfering with their duties and obligations to the Company. There are many things business owners must do to maintain their businesses; it would be unreasonable to expect employees to totally neglect their side-businesses when they go on sick leave.

Overall, the analysis under question #2 is somewhat academic because there are no rules prohibiting employees from engaging in any activities related to their side-businesses while they are on sick leave; the Union is not challenging the reasonableness of the existing Company rules related toward outside employment, which are limited to activities which interfere with duties and obligations toward the Company; and the Company has not accused Johnson of performing activities toward his side-business which interfered with his obligations to the Company. However, to the extent the Company were to argue a rule prohibiting any and all activities related to a side-business while an employee is on sick leave is reasonable, the Arbitrator should reject that argument. The existing Company rules do not say that (in fact, they provide to the

20

contrary), and the Company is not permitted to make new rules and apply them in an arbitration proceeding.

### 3.    Investigation/Fair Investigation

While the Company performed somewhat of an investigation, it was unfair, biased, and incomplete. The Company started investigating and surveilling Johnson in early June. When the first investigation did not reveal any wrongdoing, the Company took surreptitious photos of Johnson at Mackinac Island, which the Company now concedes are irrelevant, but made a big deal about at the grievance meeting and the arbitration hearing until it was finally forced to concede "the whole Mackinac thing is a total red-herring." (Tr. 236). If it was a red-herring, then why did the Company mention it in its opening statement and introduce evidence about it? (*See* Tr. 10).[4] The Union is glad the Company finally recognized Johnson did nothing wrong by going to Mackinac with his wife, but the evidence demonstrates that the Company unfairly factored that into its discharge decision.

The most egregious aspect of the Company's investigation, however, was its unilateral determination to overrule Dr. Cooper's medical opinion that Johnson was not ready to return to work based on the "Medical Disability Advisory Guidelines." (Tr. 74). As the Company acknowledged, the "Medical Disability Advisory Guidelines" are just "guidelines" and cannot be applied to everyone in the same manner. (Tr. 78). It goes without saying that the healing process from knee surgery will vary greatly from individual to individual. Some people will heal quicker than what the guidelines provide for, and some will heal slower. The factors that go into the

---

[4] "[O]ur vice-president of distribution, our number 2 in the company was up in – is it Mackinac Island. . . . And while he was on vacation up there, happened to see the grievant strolling down the Grand Hotel Veranda. . . . And so an investigation was done."

21

healing process are innumerable (age, extent of injury, success of the surgery, pre-existing conditions, overall health, *etc.*), which is why the decision as to when someone is healed and ready to return to work after surgery must be made by a physician and cannot be arbitrarily based on "guidelines." In Johnson's case, he suffers from rheumatoid arthritis which increased inflammation and slowed the healing process, and his job requires him to wear a boot which aggravates the knee. The Company was apparently not interested in learning the truth about Johnson's healing process, because it made the decision to terminate him without having all the information or obtaining a second opinion.

In explaining his discharge decision, Stairhime went so far as to accuse Johnson of "deception" and "fraudulent behavior." (Tr. 131). So, essentially, we have a well-respected orthopedic surgeon saying Johnson is not ready to return from knee surgery, and the Company decides, unilaterally and with no medical support, that Dr. Cooper is wrong and Johnson is lying. And then, when the Company asks Johnson for even more medical documentation, and Johnson obliges and turns his entire file over to the Company, the Company refuses to consider it and proceeds with Johnson's discharge. Clearly, the Company's "investigation," such as it was, was not aimed at finding the truth, but rather was a results-based investigation aimed only at gathering evidence to discharge Johnson. This biased investigation leads to an answer of "No" to questions 4 and 5 of the Just Cause Tests.

### 4. Proof

There is no proof Johnson engaged in any "outside employment" while he was on sick leave. The uncontradicted evidence is he did not perform any work or earn any income from his side-business before he was discharged. Johnson did not perform any jobs for his side-business

22

until October 2017, after he had already been terminated. The extent of Johnson's activities related to his side-business while he was on leave are as follows: (1) He recorded the business with county recorder; (2) He dropped off a flyer with a potential customer; and (3) He opened a bank account. These activities were sedentary—no different than ordinary activities of daily life—and not remotely comparable to the duties of his Lineman job.

Nothing Johnson did related to his side-business while he was on sick leave conflicted with the restrictions placed on him by his doctor. They did not interfere with his duties and obligations toward the Company, which were to follow his doctor's orders and get back to work as soon as the doctor said he was able to. The Company will say Johnson had a duty to perform light-duty work even if he was not capable of returning to his Lineman job. Fair enough, but the evidence establishes that Johnson was never offered any light-duty work; his physician said he was not capable of returning to any work; and Johnson never refused any light-duty work. These facts are indisputably established by the following testimony:

Q. Did you ever assign Dan light-duty work?

A. I could not assign him light-duty work until he was released to come back for light-duty.

Q. And that never happened, right?

A. No.

Q. So the answer to my question is, no, you never assigned him light-duty work?

A. Correct.

Q. Okay. And, therefore, Dan never refused a light-duty assignment, did he?

A. No, he did not, not to me.

23

(Tr. 137-38; 138). Furthermore, Stairhime never provided a list of available light-duty jobs to the Recovery Center, and no available light-duty jobs were provided to Dr. Cooper for his consideration. (Tr. 66-67).

Even though Johnson was never offered any light-duty work or cleared to return to light-duty, he did visit the Avilla office to inquire what types of light-duty work might be available to him. (Tr. 189-90). If the Company had suggested something, Johnson could have taken it to his physician to see whether it would be advisable for him to perform that work. Johnson simply cannot be disciplined for not accepting light-duty work that was never offered to him.

### 5. Equal Treatment

While the Union is not making a disparate treatment argument in this case, it is worth noting that other employees in Avilla have maintained side-businesses. There was never any issue with their side-businesses, nor did the Company present any evidence that employees are expected to cease activities toward their side-businesses when they go on sick leave. This is important because Johnson began to start his side business before he went on sick leave. It is inconceivable that the other employees who maintain side-businesses never went on any kind of leave. If they had been told they were expected to cease all activities toward their side-business during a period of leave, one would expect that evidence would have been presented at the hearing. The point is, it appears that Johnson's side-business was treated differently than other employees' side-businesses.

### 6. Penalty

Even if the Arbitrator were to conclude that Johnson engaged in misconduct for which the Company was justified in disciplining him (which she should not), the penalty of summary

24

discharge is vastly disproportionate to the offense. It is axiomatic in labor arbitration that even where an employee is found to have committed an offense, the employer must, except in cases of extremely egregious misconduct, apply progressive discipline rather than summary termination. *Providence St. Peter Hosp.*, 123 LA 473, 479 (Gaba, 2006). The penalty imposed must be "fair and reasonable to the circumstances of the case." *Wolverine Shoe & Tanning Corp.*, 18 LA 809, 812 (Platt, 1952). This means that the employer must consider mitigating circumstances. *Kroger Co.*, 108 LA 417, 421 (Baroni 1997) ("mitigating circumstances must be considered in assessing the appropriateness of the disciplinary action.") (quoting *ACF Industries*, 79 LA 650, 652 (Cohen, 1982)).

In *Huntington Chair Corp.*, 24 LA 490 (McCoy, 1955), prominent labor arbitrator Whitley McCoy noted that the penalty of summary discharge is reserved for only the most egregious offenses. He stated:

> Offenses are of two general classes: (1) those extremely serious offenses such as stealing, striking a foreman, persistent refusal to obey a legitimate order, *etc.*, which usually justify summary discharge without necessity of prior warnings or attempts at corrective discipline; (2) those less serious infractions of plant rules or proper conduct, such as tardiness, absence without permission, careless workmanship, insolence, *etc.*, which call not for discharge for the first offense (and usually not even for the second or third offense) but for some milder penalty aimed at correction.

*Id.* at 491.

The Company's Work Rules recognize the appropriateness of progressive discipline, providing for a three-step disciplinary procedure starting with a written warning. (JX 1 p. 23). The Work Rules state, "discipline for a particular offense is normally a written warning, *followed* by a suspension without pay, and *finally* discharge for recurrence of the same or similar offense."

25

(*Id.*). The Company thus violated its own Work Rules in skipping the first two steps of discipline and going straight to discharge.

Even if Johnson committed misconduct (which he did not), in no way could it be characterized as "extremely serious." Johnson's activities related to his side-business were minimal. He had no reason to believe he was doing something wrong, and he did not try to hide anything from the Company. No evidence was presented of any prior discipline imposed upon Johnson; and neither the collective bargaining agreement nor the Work Rules contain an amnesty clause, so if Johnson had any prior discipline, the Company would have entered it into evidence. Johnson had been employed by the Company for thirteen years at the time of his summary discharge. No evidence was presented that he was anything other than a quality and productive employee. Therefore, even if the Arbitrator is convinced that Johnson committed some form of misconduct for which discipline was appropriate, summary discharge was contrary to the Company's Work Rules and far too harsh of a penalty; the discipline should be reduced to, at most, a written warning in accordance with the Work Rules.

## VI.   CONCLUSION AND REMEDY REQUESTED

In sum, the Company's summary discharge of Johnson fails the Just Cause Tests on many levels. Therefore, the stipulated issue should be answered in the negative, that is, that the Company's discharge of the Grievant, Daniel Johnson, was not for justifiable reasons. As a remedy, the Union requests that the Arbitrator sustain the Grievance and direct the Company to remove any references to the discharge from Johnson's personnel file and reinstate him to his Lineman A position in Avilla with uninterrupted seniority and full back-pay and benefits. The

Union further requests that the Arbitrator retain jurisdiction over this matter to resolve any

disputes over the remedy or its implementation.

Respectfully submitted,
FILLENWARTH DENNERLINE GROTH
& TOWE, LLC

By: */s/ David T. Vlink*                .
David T. Vlink
*Attorney for the Union*

Dated: February 18, 2019

27