**IN THE MATTER OF THE ARBITRATION**

BETWEEN

**INDIANA MICHIGAN POWER COMPANY**

AND

**LOCAL UNION 1392**
**INTERNATIONAL BROTHERHOOD**
**OF ELECTRICAL WORKERS**

FMCS Case No. 180403-03207
(Grievant Daniel Johnson)

ARBITRATOR: **CYNTHIA STANLEY**

## POST HEARING BRIEF OF INDIANA MICHIGAN POWER COMPANY

Thomas H. Dawson
Labor Relations Manager
P. O. Box 60
Indiana Michigan Power Center
Fort Wayne, IN 46801

Advocate for Indiana Michigan Power Company

1



## Table of Contents

I. Introduction…………………………………………………….    3

II. Issue…………………………………………………………...    3

III. Relevant CBA Provisions – Master Agreement ………………….    4

IV. Relevant AEP Employee Handbook Provisions……………………....    4

V. Relevant Sick Pay Plan Provisions………………………………….    6

VI. Background and Facts……………………………………………    7

VII. Argument……………………………………………………    9
      A. Overview of the Company's Burden………………………..    9
      B. The Company's Rule and Policy on Outside Employment
         are clear and reasonable and the grievant had notice………    10
      C. The Grievant violated the Company's Rule and Policy
         Regarding Outside Employment……………..………………    14
      D. The Grievant's termination was for Justifiable Reasons…….    25

VIII. The Grievant's Arguments are without Merit………………………..    28

IX. Conclusion……………………………………………………….    32

## I.  INTRODUCTION

The grievance at issue originated in Indiana Michigan Power Company's (hereinafter I&M) Fort Wayne District.  I&M is an electric utility with various electrical energy distribution, transmission and generation facilities spread throughout southwestern Michigan and Northern Indiana.[1]

The International Brotherhood of Electrical Workers Local 1392 represents the hourly production and maintenance employees in the Fort Wayne District including the journeyman linemen (known as Line Mechanic A's).

The grievance, filed on behalf of Daniel Johnson protesting his termination on July 20, 2017, was submitted to arbitration in accordance with the terms of the Collective Bargaining Agreement between IBEW Local 1392 and the Company, effective February 17, 2015 through March 31, 2108.[2],[3],[4]  An arbitration hearing was held in Fort Wayne on December 5, 2018.

## II. ISSUE

Was the termination of the grievant, Daniel Johnson for justifiable reasons?  If not, what is the appropriate remedy?  (TR 7, 12)

---

[1] I&M is one of seven wholly owned utility company subsidiaries of American Electric Power (hereinafter AEP). The use of the terms I&M and AEP are often interchangeable and many of the Company policies and procedures are branded as AEP although they also apply to I&M and the other six AEP utility companies.

[2] The Collective Bargaining Agreement includes being covered by the IBEW "Master" Collective Bargaining Agreement with AEP (Joint Exhibit 1) as well as covered by a "Local" Collective Bargaining Agreement with I&M for the production and maintenance employees (Joint Exhibit 2). (See Article VI, Section 2 of the Local Agreement that defines that the Collective Bargaining Agreement means both the "Master" and "Local" Agreements)

[3] It was undisputed by the Union that it took almost 6 months to get the grievance scheduled because the Union reported that the grievant was unavailable and working hurricane restoration work in the Caribbean (TR 233).

[4] All ("TR") references are to pages of the transcript of the hearing before Arbitrator Cynthia Stanley on December 5, 2018.

### III. **RELEVANT CONTRACT PROVISIONS – Master Collective Bargaining Agreement**

**ARTICLE II**
**MANAGEMENT AND UNION RELATIONSHIP**

(a) Except as otherwise specifically limited in this Agreement, the Company has the right to exercise the regular and customary functions of management, subject, however, to the employee's privilege of bringing a grievance as provided for in this Agreement.

(b) The rights, powers, and authorities mentioned in (a) above shall include but shall not be confined to the following:

      (1)    The right to determine equipment to be used, the process, techniques, methods and means of operation, production, transmission and distribution, the schedules of production, schedules of working hours, standards of quality and workmanship; the right to establish, maintain and amend reasonable working rules and regulations [including safety rules, programs and regulations] and job classifications and job descriptions and the necessary qualifications for all job classifications including reasonable residency requirements of employees required to perform the work.

      (2)    The right to create, eliminate, modify or combine jobs; the right to assign work and contract work; the right to determine manning needs, including the number and classifications of employees to be used on specific jobs and in the general operation of the Company's business; the right to lay off employees due to lack of work or for other reasons.

      (3)    The authority to hire, promote, demote or transfer, assign to shifts, **maintain discipline and efficiency; and the right to warn, suspend, discharge or otherwise discipline employees for justifiable reasons.**

      (4)    The Company shall also have the right to assign or contract work to persons or organizations not represented by a Local Union. This right is limited only to the extent that it shall not be exercised when such actions directly result in the layoff or discharge of any employee covered by this Agreement. In the event of arbitration over the Company's exercise of the right set forth herein, the sole question for the arbitrator shall be whether the Company has violated the foregoing limitation.

(c)    Where the rights, powers, and authorities itemized in (b) above are modified or limited by the terms and provisions of this Agreement they shall only be modified or limited to the extent specifically provided therein (Emphasis Added) (Joint Exhibit 1, page 10).

### IV.    **RELEVANT AEP EMPLOYEE HANDBOOK PROVISIONS**

# CORRECTIVE DISCIPLINE POLICIES AND PROCEDURES

4

## *Introduction*

In any well-ordered community, laws are necessary to protect the rights of the citizens, as well as their lives and property. The same situation prevails in this company, where a large number of employees work together. One person's misconduct may harm all the rest. Therefore, employees should expect standards of conduct to be established and maintained. It is the responsibility of management to make and enforce reasonable rules to increase or maintain efficiency. To this end, the company now has in effect – and will establish from time to time – such rules, as it considers necessary.

## *Rules of Conduct*

The large majority of employees will maintain an acceptable standard of honesty and ethical human behavior. For the few exceptions found in any large group of people, however, rules of conduct have been established. Any one of the following offenses or any self-evident breach of discipline not forbidden by any published policy or rule, but which is clearly harmful to the orderly conduct of the business, to the safety of employees or equipment, or which is against generally accepted standards of moral conduct, will be grounds for disciplinary action varying from written warning to discharge, depending upon management's judgment as to the seriousness of the offense:…

30. Engaging in outside employment or activities, which may interfere with duties and obligations to the company.

## *Discipline*

It is our belief that the highest type of discipline is that which originates within the individual employee. Self-discipline in the employee group is the company goal; however, for those occasional instances where self-discipline and mutual cooperation do not prevail, supervisors will take corrective actions, subject to the employee's right to appeal.

## *Types of Disciplinary Action*

It is company policy to recognize and apply three forms of disciplinary action:
1. Written warning;
2. Suspension, either (a) without pay and without work, or
   (b) with pay and with work (working suspension);
3. Discharge.

A supervisor, as a matter of information and training, may give oral warnings, but such warnings will not be considered as formal discipline.

Initial discipline for a particular offense is normally a written warning, followed by a suspension without pay, and finally discharge for recurrence of the same or similar offense. Discipline for exempt and supervisory employees who are not covered by the Grievance and Arbitration procedure may differ….

Whether or not the employee has received any prior discipline of any kind, suspension or discharge may be imposed when the seriousness of an individual offense and/or the employee's accumulated employment record indicates that such action is required. (Joint Exhibit 3, pages 21-24).

## *Outside Employment*

Employees who accept employment with other companies during their off-duty hours should exercise care to avoid conflicts of interest. The company policy in this regard is defined as follows:

- Employees should not engage in any outside employment that may interfere, directly or indirectly, with the full and proper performance of such employees' duties in, and obligations to, the company.

- Employees should not place themselves in a position where they have any material interest in or would personally benefit from any sale of goods or services to, or any kind of transaction with, any company in the AEP System.

If there is any question about the application of this policy, the employees involved should either terminate the outside employment at once or, if they believe that such outside employment will not interfere with the proper performance of their duties and will not involve any conflicts of interest, advise the supervisor of the facts. Violations of this policy will be regarded as cause for disciplinary action, which may include discharge.

An employee who is engaged in outside employment automatically relinquishes the right to all company benefits under the sick pay and medical plans for injuries or sickness that occur in the course of such outside employment. (Joint Exhibit 3, Page 29).

## V. <u>RELEVANT SICK PAY PLAN PROVISIONS (Company Exhibit 6)</u>

"AEP's commitment extends to times you cannot work because of illness or injury" (page 0)

"With the AEP Sick Pay Policy, you and your family are financially protected on a short term basis in the event an illness or injury prevents you from working…" (Page 1)

"if you are a full-time employee and are disabled…" (Page 1)

"…you may be asked to provide objective written proof or your continued inability to work" (page 1)

"You may be asked to provide written objective documentation from a health care provider certifying the reason for the absence, expected date of return, and written proof of continuing inability to work" (Page 2).

"If you cannot work because you are ill or are disabled, you will receive a percentage of your base pay…" (Page 4)

"Generally, benefits under the policy will terminate on the earliest of the following dates:"
    -Your illness of injury ends, or you recover sufficiently to enable you to perform work…"

- You fail to submit, when requested, sufficient written objective medical information relating to your illness or injury which supports a functional impairment preventing you from performing your occupation or a reasonable employment option…"
- You refuse to try or attempt work with the assistance of the following if available:
  - Modifications made to your work environment, functional job elements or work schedule"

## VI.    BACKGROUND AND FACTS

The grievant was employed by the Company as a Line Mechanic A at the Avilla, Indiana Service Center.  A Line Mechanic A is the "journeyman" position responsible with a line crew for the construction and maintenance of the Company's electric distribution system (TR 118).

In March 2017, the grievant was having knee pain and he went off work and ultimately had surgery to repair his left knee.  It was undisputed that he was previously off work for surgery to his right knee in 2012 and came back on restricted duty assignments (also know as light duty assignments) prior to his return to full duty as a Line Mechanic A (TR 155).

The Company has a Sick Pay Policy for its employees which provides pay for employees who cannot work due to illness or injury (Joint Exhibit 6).[5]  Eligible employees are provided with 26 weeks of sick pay with the amount of pay based on the employee's years of service.  In the grievant's case his sick pay was at 100% of his base pay (TR 22).

---

[5] The Company and Union have negotiated that Union represented employees may participate in the Company's System Benefit Plans including the Sick Pay Plan (Joint Exhibit 1, Page 39).  The Parties have also agreed that an arbitrator has no authority to pass upon any question relating to benefits provided in the System Benefit Plans including the Sick Pay Plan (Joint Exhibit 1, Pages 45-46).

A timeline of events that occurred in the grievant's case follows:

| Date | Event (Documentation) |
|------|------------------------|
| 3/23/17 | First Day Absent – Medical visit with Nurse Practitioner Price.  X-rays of left knee taken.  Release to return to work on 4/3/17. (TR 26)(Company Exhibit 1, pages 1) |
| 3/30/17 | Grievant reports that Doctor injected knee and he was sent to Physical therapy to get some home exercises.  Still has release to return to work on 4/3/17 (TR 29-30)(Company Exhibit 1, Page 5). |
| 4/3/17 | Employee reports he is having an MRI and will not be returning on 4/3 as scheduled (TR 32-33)(Company Exhibit 1, Page 15). |
| 4/7/17 | First Certificate of Disability/Attending Physician Statement (COD) received.  No release date noted pending MRI and follow up.  No work yet and no light duty work yet (TR 35)(Company Exhibit 1, Page 26). |
| 4/21/17 | Left Knee arthroscopy for left knee meniscus tear (TR 36)(Company Exhibit 1, Pages 30, 33). |
| 5/4/17 | Second COD received.  Off work until next appointment - 6/5.  No release for light duty.  Approximate return to full duty – 6/30 (TR 37-38)(Company Exhibit 1, Page 39, 42). |
| 5/8/17 | Sick Pay approved through 6/2 which is 6 week post-op (TR 39)(Company Exhibit 1, Page 44). |
| 5/8/17 | Grievant reports to Recovery Center that "…he is doing well, all pain from before is gone" (TR 39)(Company Exhibit 1, Page 46). |
| 6/5/17 | Grievant has full duty release for 6/26/17 (TR 40-42)(Company Exhibit 1, Pages 53, 58). |
| 6/22/17 | Grievant reports that he is not progressing as he should be and will not be returning on 6/26 as previously reported (TR 44)(Company Exhibit 1, Page 68). |
| 6/26/17 | Grievant informed that sick pay suspended based on insufficient evidence to substantiate the payment of sick pay (TR 44-45)(Company Exhibit 1, Page 69-71). |
| 6/27/17 | Information received regarding grievant's business (TR 46)(Company Exhibit 1, Page 73-76). |

8

| 6/29/17 | Third COD received – No work yet, no explanation regarding treatment, no restrictions noted no explanation of light duty potential despite email from Company on 6/15 inquiring about light duty (TR 47-48)(Company Exhibit 1, Pages 81-84). |
|---------|------|
| 6/30/17 | Grievant photographed on Mackinaw Island on vacation (TR 49)(Company Exhibit 1, Pages 91-93). |
| 7/6/17  | Despite requirement to submit objective medical evidence to support Sick pay all that grievant submits is a doctors slip indicating off work for another month (TR 50-51)(Company Exhibit 1, Pages 97-98, 102). |
| 7/19/17 | Investigation discussion with the grievant.  Grievant denied self-employment (TR 211-212). Grievant suspended pending completion of investigation (TR 129-131) |
| 7/20/19 | Grievant terminated (Joint Exhibit 4). |

Following an investigation and after interviewing the grievant, it was determined that he had violated the Company's Rule and Policy on Outside Employment and the grievant was terminated.

## VII.   ARGUMENT

I&M respectfully submits that it had a justifiable reason to terminate the grievant. He was terminated after it was determined that he violated Company rules and policies. The grievant had no excuse or can offer no mitigating circumstances that would justify overturning the termination.  The Company's position remains that his termination was for justifiable reasons.

### A. Overview of the Company's Burden

As this case involves a termination, the Company bears the burden of establishing that it had a justifiable reason for terminating the grievant.  While there is no precise definition of "justifiable reason", this concept has usually covered two basic issues – whether the grievant is guilty of wrongdoing and if so, whether the punishment assessed by management should be upheld or modified.

It is a basic tenet of arbitration that once wrongdoing is proven that an arbitrator should not overturn management's decision unless management's decision was "arbitrary, capricious, unreasonable or based on mistake of fact." Trans World Airlines, Inc., 41 LA 142, 143-144 (Beatty 1963); St. John's River Power Park, 125 LA 191-192 (quoting Trans World Airlines).  In Stockholm Pipe Fittings Co., 1 LA 160, 162 (McCoy, 1945), the arbitrator stated:

> "… Where an employee has violated a rule or engaged in conduct meriting disciplinary action, it is primarily the function of management to decide upon the proper penalty. If management acts in good faith upon a fair investigation and fixes a penalty not inconsistent with that imposed in other like cases, an arbitrator should not disturb it. The mere fact that management has imposed a somewhat different penalty or a somewhat more severe penalty than the arbitrator would have, if he had had the decision to make originally, is no justification for changing it."

## B. The Company's Rule and Policy regarding outside employment are clear and reasonable and the grievant had notice of the requirements.

The Union has recognized the right of the Company to make and enforce rules and regulations and that the violation thereof will be a justifiable reason for discipline, including termination.  The Union and Company have negotiated in the Master

10

Collective Bargaining Agreement that the Company has all the normal operating rights of management including:

> "the right to establish, maintain and amend reasonable working rules and regulations [including safety rules, programs and regulations]… (Joint Exhibit 1, page 10).

The Company's Rule against Outside Employment is clear and unambiguous.  It prohibits "…outside employment or activities which may interfere with duties and obligations to the Company" (Joint Exhibit 3, page 22).  While that Rule is distinct, the Company's Outside Employment Policy further clarifies the prohibition regarding outside employment:

> "Employees should not engage in any outside employment that may interfere directly or indirectly, with the full and proper performance of such employees' duties in, and obligation to, the company…. If there is any question about the application of this policy, the employees involved should either terminate the outside employment at once or, if they believe that such outside employment will not interfere with the proper performance of their duties and will not involve any conflicts of interest, advise the supervisor of the facts. (Joint Exhibit 3, Page 29)

The Company's Policy is the epitome of reasonableness.  Sick Pay is provided to employees who are disabled from performing their job duties.  Along with the payment of sick pay at 100% of the employee's base pay, the employee accepts two obligations. The first is to provide written objective medical documentation certifying the reason for the absence, the expected date of return and written proof of the inability to work (Joint Exhibit 6, Pages 1, 2 and 6).  The second obligation is to do the things necessary to get better so that the employee can return to work which may include modifications to the work environment, the functional job elements or the work schedule (Joint Exhibit 6, page 6).  Performing activities which are outside of an employee's restrictions or which

11

aggravate a medical condition and prolong an employee's paid time off breaches that

obligation and responsibility. Arbitrator Marvin Feldman expounded on that obligation in

*Catlettsburg Refining LLC*, 124 LA 1073:

> "Sick leave, especially when paid by the Company is a period of time in the
> employee's workload, when the employee should be using this time to get well,
> so that he can get back to gainful employment under the rules of the facility. In
> this particular case, the grievant apparently accomplished work at home, while
> being paid by the company for sick time. When confronted the grievant denied.
> So the grievant is not only guilty of accomplishing a workload during the period of
> sick pay, while at home, but the grievant is also guilty of dishonesty, in denying
> that such workload occurred, until he saw the videos to the contrary. A re-
> reading of the termination of this, directs the grievant's attention to such activity.
> Not only did the grievant be dishonest with the company, the grievant acted in
> such a way, so as to forestall his expeditious return to work from his injury. The
> time the grievant spends away from work on paid sick leave, is time to be spent
> in the recovery of that grievant, not in the grievant's workload, whether it be at
> home or elsewhere. Lying about it nearly exacerbates the wrongdoing." (124 LA
> 1073, 1077)

Likewise, in *City of Pueblo,* 132 LA 1445, Arbitrator Robert Landau declared:

> "I agree with the City that the two challenged (sick leave) policies are reasonable
> and limited regulations attempting to ensure that employees who are on paid sick leave
> status do not abuse or endanger that status by engaging in outside employment or
> other activities that may impede recovery from an injury or illness. This is a reasonable
> and legitimate business purpose within the City's management rights." 132 LA 1445,
> 1450

The same is true for the Company's Rule and Policy on Outside Employment. The

Rule and Policy do not restrict outside employment or activities. It is outside

employment and activities that interfere with the employee's duties and obligations to

the Company that are restricted. That restriction is clearly reasonable and within the

legitimate business interests of the Company.

As far as notice of the Company's Rule and Policy on Outside Employment there are many different ways in which the grievant was on notice of the need to follow the Rule and Policy regarding outside employment or face disciplinary action.

The first is common sense. It's almost impossible to imagine that any employee could think they could be off work on 100% sick pay, be declared as unable to work at all by their medical provider but yet believe they can run a business. As Supervisor Stairhime testified he was a little upset that the grievant was out marketing his business but could perform no work at all (TR 126, 129).

Second, employees also have notice of disciplinary action for the rules listed in the Company's Discipline Policy:

### *"Rules of Conduct*

The large majority of employees will maintain an acceptable standard of honesty and ethical human behavior. For the few exceptions found in any large group of people, however, rules of conduct have been established. **Any one of the following offenses** or any self-evident breach of discipline not forbidden by any published policy or rule, but which is clearly harmful to the orderly conduct of the business, to the safety of employees or equipment, or which is against generally accepted standards of moral conduct, **will be grounds for disciplinary action varying from written warning to discharge, depending upon management's judgment as to the seriousness of the offense:...**

30.     Engaging in outside employment or activities, which may interfere with duties and obligations to the company." (Emphasis Added)(Joint Exhibit t1, pages 21-22)

Third, the Company's published Policy on Outside Employment also provides for discipline in the event of a violation noting that not only does the employee have an obligation to notify their supervisor of any potential conflict but also that "Violations of

this policy will be regarded as cause for disciplinary action, which may include discharge

(Joint Exhibit 3, page 29).

Simply put the grievant was clearly on notice from multiple sources that further

violations of the Company's Rule and Policy on Outside Employment could result in

termination.

## C. The grievant violated the Company's Rule and Policy regarding Outside Employment.

The grievant left work on March 23, 2017 and went to the doctor to have his left

knee examined (TR 121-122). He never returned to work even for a restricted or light

duty assignment before his termination more than four months later on July 20, 2017.

According to the grievant he could not work, not even a light duty assignment. His

entire position is that the doctor had not released him for any duty, not even light duty

(TR 221, 227).

### 1. The Company's Light Duty Assignments

The Company has always provided light duty assignments for employees recovering

from an illness or injury (TR 142). As Supervisor Stairhime testified, "that's what we do"

(TR 149). Even the Sick Pay Plan recognizes that there are restricted duty assignments

and provides further that sick pay benefits terminate if the employee refuses to try to

work with modifications made to the "...work environment, functional job elements or

work schedule" (Joint Exhibit 6, pages 3, 6). The Company's Recovery Center's

14

function, according to Benefits Administrator Hetrick is to manage disability cases so that an employee can come back to work in a "…light duty or what we call modified-duty or restricted duty…" plan (TR 24).

The grievant was distinctly aware of the Company's willingness to provide a light duty assignment. Supervisor Stairhime talked to the grievant about possible light duty assignments as he continued his recovery (TR 123). The grievant in his testimony confirmed that conversation (TR 187). The grievant talked to crew Supervisor Bob Mack regarding light duty assignments (TR 189). The grievant was even talked to about sedentary, light duty positions as Supervisor Stairhime told the grievant that if enough light duty work was not available at the Fort Wayne Service Center that he could work in the Company's Distribution Dispatch Center (DDC)(TR 151). The grievant also confirmed that HR representative Cooper talked to him about working a light duty assignment in the DDC (TR 220). Simply put the grievant cannot deny knowledge of light duty assignments as he had worked light duty assignments in 2012 as he was recovering from surgery on his other knee, an assertion from former supervisor Oster that the grievant did not dispute (TR 155).

2. The grievant alleged he could not work, not even a light duty assignment.

In managing its disability cases, the Company utilizes a national Medical Disability Advisory (MDA) database to determine how long an employee should be off work based on the classification code of the illness or injury used by the doctor (TR 31-32,

15

36). In the grievant's case the MDA calculation for the grievant based on his knee surgery and the type of job he had was 47 days or 36 days to light duty (TR 36)(Company Exhibit 1, pages 28-29). Based on the grievant's surgery date of April 21st, he should have been available for a light duty assignment somewhere near the first of June and returning to full duty near the middle of June.

The grievant was well along that recovery path and had been approved for sick pay for six weeks post-operation or until June 2, 2017 (TR 38-39)(Company Exhibit 1, page 43-45). In a routine follow-up with the grievant on June 2, 2017, the grievant reported that "he was doing well" and that "the pain is all gone" (TR 39)(Company Exhibit 1, page 46). The grievant was given a full duty release for June 26, 2017 with no restrictions (Company Exhibit 1, page 58).

A few weeks later, it was the grievant's own subjective self-assessment that he was not progressing and that the therapy was not progressing (TR 44). The grievant's response to the Supervisor's suggestions for light duty assignments was "I don't know whether I can do it" (TR 152). That even included a light duty sedentary assignment working in the Company's Distribution Dispatch Center (DDC)(TR 151). The grievant even testified that he was going to have trouble with the light duty job "***that I was offered***" (TR 213). The grievant testified on cross-examination that he was not able to perform any light duty work and that he was unable to do so because of the requirement to wear a safety boot (TR 221-222). Again, that was the grievant's own self-assessment and as can be seen from all the evidence, notably

absent is any medical documentation whatsoever that the grievant was unable to wear a safety boot (TR 221-222).

On June 26, when the grievant failed to return to work as previously provided by his doctor sick pay was suspended for the grievant due to insufficient medical evidence to substantiate the payment or continuation of the sick pay benefit (Company Exhibit 1, page 97). His doctor had been notified on June 15, 2017 that the Company had a light duty program but the doctor did not respond to that request and only indicated that the grievant could not work (Company Exhibit 1, pages 82, 84).

What the grievant was doing during this period was taking a trip to Nashville (6-7 hours from Fort Wayne)(TR 222) and walking around, taking a trip to Mackinaw Island (again 6-7 hours from Fort Wayne)(TR 190-192)(Company Exhibit 1, pages 91-93) and making sales calls on prospective clients (TR 125, 127-128, 157-158). All this was taking place even though he could not work a light duty assignment even a sedentary one because he had to do what his doctor said and the doctor had not released him for light duty (TR 220-221), The problem with that line of thought was the doctor had released him with no restrictions for June 26, 2017 and after that he was being treated based on his own self-assessment of his medical condition.

The grievant's problem is that his sick pay had been suspended due to insufficient medical documentation and evidence and he allegedly could not work light

17

duty as he had not been released for even a sedentary position. Obviously, he had not discussed such light duty assignments with his doctor and he was taking long trips and the evidence obtained by the Company shows that he was engaged in self-employment. The Company clearly had an interest in investigating further and questioned the grievant regarding his activities.

Other arbitrators have held that such conflicting evidence is clearly open for examination. Arbitrator Bethel in *United States Steel Corp.*, 125 LA 657, held that a doctor's medical certification is not the only piece of evidence to be reviewed when an employee exhibits behaviors that do not match the doctor's medical opinion:

> "But the doctor's opinion is not the only evidence the Board examines, especially in cases in which an employee relies on subjective claims that he is in pain…the Board acknowledged that a doctor's certificate of disability could not stand if the evidence as a whole indicated that an employee was not disabled.: (125 LA 657, 659-660)

What the Company discovered is that the grievant was engaged in self-employment even though he allegedly could not even perform light duty assignments including sedentary work.

3. <u>The Company found out that the grievant was operating a business.</u>

Supervisor Stairhime discovered through his sources that the grievant was operating his business. The Company uses a contractor, Todd Gray in Albion, Indiana who cleans and tests the Company's distribution tools and hot sticks (TR 125). Supervisor Stairhime was at the contractor's dropping off tools to be cleaned and repaired and

picking up tools that had been cleaned and repaired.  Mr. Gray, whose son works for

Noble County REMC informed Supervisor Stairhime that the grievant had been to Noble

County REMC and dropped off his Company's brochure and business card in an

attempt to pick up some work (TR 125-126).  Mr. Gray also informed Supervisor

Stairhime that the grievant had visited the Company's Baer Field Distribution Training

Center for the same purpose (TR 126-127).


Supervisor Stairhime admitted that he was a little upset that the grievant could work

at his business but perform absolutely no work for the Company.  As a result,

Supervisor Stairhime followed up with Noble County REMC Manager Doug Dickmeyer

and confirmed that the grievant had visited that utility in an attempt to market his

business services (TR 127-128).  Similarly, Supervisor Stairhime followed up with Baer

Field Distribution Training Specialist Kim Oster regarding the grievant's visit.  There he

learned that the grievant had left copies of his business' marketing brochure as well as

business cards (TR 126-127)(Company Exhibit 1, pages 75-76, Company Exhibit 2).


The information regarding the grievant's business was turned over to the Recovery

Center who then engaged a private investigator to learn more about the business

(Company Exhibit 1, pages 73-76).  Private Investigator Doody made a pretext call to

the grievant on June 30, 2017 (TR 97)(Company Exhibit 1, page 94). What he learned

from the grievant is that the business had begun a year ago and that the grievant had a

"captive audience" of clients and that he traveled to utility barns in Indiana, Michigan

and Kentucky to perform his services.  The grievant also claimed that he had recently performed some work for an REMC (TR 98-100)(Company Exhibit 1, page 94).

    4.  <u>The grievant was working</u>.

While the grievant in his self-serving testimony disagrees, it is abundantly clear that he was working during the time that his was off work, collecting 100% sick pay and yet unable to perform work of any kind for the Company.

As our Arbitrator well knows, running a business is hard work.  And, there is a vast difference between running a business and running a *successful* business with all the attendant details.

One of the first details in running a business is securing adequate capital to fund the business.  The grievant testified on cross-examination that the business was actually funded well in advance of his absence that started on March 23, 2017 (TR 226).  He further testified that it was his wife who provided the capital and that he "…needed to pay his wife back when I could" (TR 226).

A second aspect in running a business is the use of the capital and the purchase of equipment.  The grievant testified that he used the capital funding provided by his wife to purchase equipment (TR 227).  When the grievant visited the Baer Field Training Center, one of the understandings that Training Specialist Oster left the meeting with is that the grievant had the necessary equipment to run the business (TR 159).  This

meeting occurred before June 27th as Supervisor Stairhime was able to obtain the marketing brochure and business cards from Training Specialist Oster prior to June 27th (Company Exhibit t1, pages 73-76).

Another detail completed by the grievant is that he had the business legally recorded with the State of Indiana and Noble County on June 14, 2017 (TR 193)(Union Exhibit 2). The Certificate for recording the business was revised approximately one month later to add his wife's name as one of the owners of the business (TR 194).

Still another factor in running a business is the creation of marketing material. This is another element that the grievant had completed and put into use while he was off on sick pay even though he contends he could not work. He had created a marketing brochure for his business which was provided during the grievant's sales call to Noble County REMC and the Company's Baer Field Distribution Training Center (TR 126, 196)(Company Exhibit 1, pages 75-76). That marketing material for Johnson Live Line Utility Fiberglass Testing and Repair promised "quick service" detailed the services that he provided, the prices he charged for those services and his hours of operation. The most perplexing element of his marketing material is that his hours of operation were 9:00 am to 5:00 pm Monday through Thursday; 9:00 am to 6:00 pm on Friday; and, 9:00 am to 12:00 pm on Friday (Company Exhibit 75). Those stated business hours conflicted completely with his normal work hours of 7:00 am to 3:30 pm, Monday through Friday (TR 174). In viewing these hours of operations it becomes very evident that he claimed he could not have worked any type of light duty for the Company and

yet maintained the marketing and operations necessary for running a successful business.

Another aspect of operating a business and closely related to marketing materials was the creation of business cards to provide to prospective clients. The grievant had created business cards and provided them to at least Noble County REMC and the Baer Field Distribution Training Center (TR 126)(Company Exhibit 2). The grievant even admitted during testimony that he was able to obtain additional potential business contacts as a result of providing these marketing materials (TR 208).

Even after implementing all the necessary factors to operate a business such as obtaining capital, purchasing equipment, properly recording the business with governmental entities, and developing marketing materials, one vital aspect of operating a successful business continued to be selling the business including meeting with potential customers and obtaining customers. The grievant was also able to fulfill this aspect of operating a business during the period he was on sick pay at 100% of his base pay but, at least according to him, he was unable to work even at any light duty assignment, including a sedentary light duty assignment in the DDC.

It is beyond any doubt that he was meeting with potential clients during this period. In June 2017, he met with Noble County REMC management in an attempt to obtain them as clients. The grievant admitted during cross-examination that his visit to Noble

County REMC was a "cold call" or an attempt to drum up business (TR 223). The grievant even admitted during his testimony that the cold call was work –

> "As far as my ***recent work***, yeah, I had visited an REMC" (Emphasis Added((TR 201)

Training Specialist Oster at the Baer Field Distribution Training Center also agreed during his testimony that the grievant's visit there was an attempt to obtain business (TR 158).

The completion of all these dynamics in running a business is proof that the Grievant was engaged in outside employment during the time that he was off work being paid at 100% of his normal base pay and unable to work, even at a light duty assignment.

When faced with all of these proofs that the grievant was in fact running a business during this time, the grievant maintained only one argument – that he was not working because he hadn't made any money yet (TR 200, 211-212, 225). The grievant tried to supplement this argument with evidence showing when he finally opened a bank account for his business (TR 204)(Union Exhibit 3).

However, further testimony from the grievant slays his self-serving argument. When questioned by Supervisor Stairhime on July 19, 2017 about operating a business the grievant denied he was doing so (TR 211-212). However, his denial came ***after*** he funded the business, purchased the necessary equipment, created marketing materials opened a bank account for the business and began calling on potential customers.

Clearly his testimony and his denial to his Supervisor lack any credibility.  Similarly, on cross-examination, he testified that prior to working for the Company he had been a farmer.  When working as a farmer the same aspects of running a business come into play – obtaining capital for planting a crop, obtaining equipment and marketing the potential crop.  The grievant admitted that as a farmer he was working even though he would not get paid until the crop was harvested and sold (TR 225).  Thus, he clearly recognizes that operating a business includes many aspects of working even prior to the first dime of revenue comes in which invalidates his claim of not working because he had not made any money.

5.  <u>The grievant violated the Company's Rule and Policy on Outside Employment.</u>

There are three aspects to the Company's Rule and Policy on Outside Employment and Activities.  The first is that the employee is engaging in outside employment or activities.  The Company has proven, despite the grievant's denials, that he was engaged in outside employment and running his business.

The second aspect is whether the outside employment or activities interferes with the employee's duties and obligations to the Company.  Again, a review of the facts and circumstances in this case clearly shows that the grievant was off work collecting 100% of his base pay as sick pay, but yet unable to perform any work including any form of light duty even working at a sedentary position.  Therefore, if the grievant could not work ***at all***, then he was in no position to work at his business while collecting full pay.

24

Clearly, working at his business and collecting full sick pay while unable to work interferes with his duties and obligation to the Company.  Thus, this second aspect of the Outside Employment Rule and Policy were also violated.

The third factor of the Outside Employment Policy, provides that if the employee believes that the outside employment will not interfere with the proper performance of their duties and obligation to the Company, the employee is required to "…advise their supervisor of the facts" (Joint Exhibit 3, page 29-30).  Not only did the grievant fail to notify his supervisor of any facts regarding his self-employment, when questioned about operating the business while off on sick leave, the grievant ***denied*** doing so (TR 211-212).

A review of these facts and circumstances clearly show that the grievant violated the Company's Rule and Policy on Outside Employment.

**D. The Grievant's termination was for justifiable reasons**

The fact of the matter is that the grievant violated the Company's Rule and Policy regarding Outside Employment which the Company views as a very serious matter and absolute failure to meet the Company's expectations.

The Company's Corrective Discipline Policy and Procedure provides that:

1. the Company may impose discipline up to and including discharge for a rules violation,
2. the severity of discipline depends upon management's judgment (Joint Exhibit 8, pages 21-24)

The grievant's termination is ample evidence of how serious the Company views a violation of the Company's Rule and Policy on Outside Employment.

The parties have negotiated and agreed that the represented employees can participate in the Company's benefit plans including the Sick Pay Plan (Joint Exhibit 1, page 30). The only way to qualify for sick pay is to be disabled and unable to work at work which does not interfere with duties and obligations to the Company.

The Company's Discipline Policy provides that the Company may discharge an employee for a first incident based on management's view as to the seriousness of the incident:

> "Whether or not the employee has received any prior discipline of any kind, suspension or discharge may be imposed when the seriousness of an individual offense and/or the employee's accumulated employment record indicate such action is required." (Joint Exhibit 2, page 38)

Management views the behavior exhibited by the employee as a very serious breach of conduct and terminated his employment as a result. Collecting 100% full pay while claiming disability and being unable to work but yet performing work at self-employment is a very serious breach of trust and the employment relationship. No Company should tolerate such activity and it should be met with the most serious discipline to curb any future violations. No Company can survive if they continually pay employees full pay as

sick pay while they are off work and unable to perform any work but yet working at self-employment. When the Company confronted the grievant – he denied it and attempted to justify his violation by claiming that he was not working because he had received no income yet. The grievant was dishonest on several fronts. He either was disabled and violated his restrictions through the work he performed or in the alternative wasn't as disabled as he told his doctor and performed his self-employment work while collecting 100% sick pay. Honesty is an absolute necessity for the relationship between a Company and an employee. As Arbitrator Mollie Bowers explained in *Huron Line Co.,* 106 LA 997:

> "Dishonesty destroys the trust which is essential to the relationship between an employer and an employee….[I]t is so obvious that dishonesty constitutes a dischargeable offense that no employee can claim ignorance of the rule or the consequences…" (106 LA 997, 1004-1005).

The Company has a reasonable Rule and Policy in dealing with employees who partake in outside activities or employment that are in conflict with their duties and obligations to the Company. The Company views such conflicts as very serious and when where a violation merits termination, especially in a case such as the instant one where the grievant denied that he was operating a business and failed to inform his supervisor of the facts as required by the Policy. There is no evidence to the contrary and the grievant's breach of trust in the employment relationship was so serious that he was terminated.

The grievant's disregard for the Company was evident in that he was paid sick pay at 100% because he was disabled but yet he chose to engage in his own self-interest through his self-employment.

All of these actions violated the Company Rule and Policy on Outside Employment and so damaged the Company-employee relationship that discharge was not only proper, it was the only logical course for the Company to take.  He proved through his actions that he is neither trustworthy nor reliable.  As such, he should have been terminated.

The Company's decision to terminate his employment was not arbitrary, capricious, or discriminatory.  Likewise, there are no mitigating factors.

VIII.   **The Union's Arguments for Mitigation of the Termination are without Merit.**

The Union attempted several different arguments in an attempt to mitigate the termination of the grievant.  The grievant's argument that he was not working was disproven earlier in this Brief.  An examination of these other arguments (outlined below) show that each one fails to show that the termination was somehow arbitrary, capricious, discriminatory or unreasonable.  A careful review of the facts and the event will show that there simply were no mitigating factors that should serve to overturn the termination.

a. The Company did not follow its Corrective Discipline Policy in arriving at the termination decision by applying progressive discipline (TR 13).

With this contention the Union is arguing that the Company needed to apply progressive discipline.  This argument in completely inaccurate and does not examine the Company's Discipline Policy, nor does it examine the facts of the discipline or the severity of the grievant's offense.

The Discipline Policy does not provide that all offenses must be subject to progressive discipline.  Rather employees are given notice that violation of the Company's rules "…will be grounds for disciplinary action varying from written warning to discharge, depending upon management's judgment as the serious offense:" (Joint Exhibit 3, pages 23-24).  As noted earlier this was a very serious offense.

What the Union failed to present is that the Company's Corrective Discipline Policy also provides that:

> "whether or not the employee has received any prior discipline of any kind, suspension or discharge may be imposed when the serious of an individual offense and/or the employees accumulated employment record indicates such action is required" (Joint Exhibit 3, page 24).

Clearly there is no requirement to treat every offense with progressive discipline. To argue that such is the case eliminates management's judgment as to the seriousness of the grievant's offense and the effect the grievant's violation has on the workplace and the employer-employee relationship.

29

In addition, such an argument by the Union also eliminates management's right, negotiated by the parties, to make the judgment to terminate someone for justifiable reasons. Obviously, buy-in to this ill-conceived argument negates language in the Collective Bargaining Agreement to which the Company and Union have agreed.

b. Disparate Treatment exists as other employees have worked at self-employment discipline for safety violations.

To bolster this particular argument the Union elicited evidence that other employees have worked at self-employment while continuing to work for the Company. Examples testified to by the grievant include running a tree trimming service and auto repair (TR 196-198). What is evident is that the Company's Rule and Policy on Outside Employment does not prohibit outside employment per se. The Rule and Policy prohibit outside employment that interferes with the employee's duties and obligations to the Company. There was absolutely no showing by the Union or grievant that the employee with the tree trimming business or the employee engaged in auto repair performed outside employment that interfered with their duties and obligations to the Company. More importantly there was no showing by the Union or the grievant that either employee engaged in self –employment while they were on sick leave and collecting 100% sick pay because they could not work.

It is the Union's burden to demonstrate disparate treatment in the administration of discipline (Solae LLC, 125 LA 349, 351). In this regard the Union had to establish that the circumstances surrounding the grievant's offenses were substantially like those

30

of individuals who received more moderate or no penalties.  There was no such demonstration.

    c. <u>The Union argued that the sales calls made by the grievant while he was on sick pay were "inconsequential" (TR 166).</u>

What this argument accomplishes is a demonstration of a complete lack of understanding of the Company's Rule and Policy regarding Outside Employment. There simply are consequences to violating Company rules and policies.  Those consequences were made known to employees through the rules and policies.  To argue that a violation becomes inconsequential creates a positon from the Union that an employee can do anything they want, even if it violates a Company rule or policy.  Such an argument is deceptive and shows no merit when the Company has proven that a violation of the Rule and Policy on Outside Employment has occurred.

## IX. CONCLUSION

All of the evidence clearly shows that the grievant ***was engaged*** in self-employment and operating a business during a period that he allegedly could not perform any work at all even light duty sedentary work assignments.  The termination of the grievant should be upheld as it was shown that the grievant violated the Company's Rule and Policy on Outside Employment.

Not only did his outside employment interfere with his duties and obligations to the Company, he failed to notify his Supervisor of the outside employment or advise him of the facts. In fact, when questioned about operating a business while he allegedly could not work and being paid sick pay at 100%, the grievant ***denied*** that he was operating a business. The Company did not act in an arbitrary or capricious fashion when it exercised its judgment and determined that termination was the proper discipline. Likewise, there were no mitigating circumstances that would serve as an excuse for the grievant's behaviors and denial.

The grievant clearly failed in his duties and obligation to the Company and violated the Company's Rule and Policy on Outside Employment when he engaged in self-employment while contending he was unable to work, even at a sedentary light duty assignment. Moreover, amplifying his violation was his denial of self-employment during the investigation. Clearly, there can be no doubt that he decision to engage in self-employment while allegedly unable to work, even at light duty and denying his activity interfered with his duties and obligations to the Company.

Therefore, it is respectfully submitted that the Company's termination of the grievant was proper in light of his violation of the Company Rule and Policy on Outside Employment. Accordingly, the grievance should be dismissed.

Respectfully submitted:


_____
Thomas H. Dawson
Labor Relations Manager
P. O. Box 60
Indiana Michigan Power Center
Fort Wayne, IN 46801

thdawson@aep.com

Advocate for Indiana Michigan Power Company